## FRANKLIN SAVINGS & LOAN CO. OF MACON et al. v. AMERICAN EMPLOYERS INS. CO.

## AMERICAN EMPLOYERS INS. CO. v. FRANKLIN SAVINGS & LOAN CO. OF MACON et al.

### No. 8834.

Circuit Court of Appeals, Fifth Circuit.

Oct. 31, 1938.

496

E. W. Maynard, S. G. Jones, and Charles M. Cork, all of Macon, Ga., for appellants.

C. Baxter Jones, of Macon, Ga., for appellee.

Before SIBLEY, HUTCHESON, and McCORD, Circuit Judges.

SIBLEY, Circuit Judge.

When the case was previously before us, 5 Cir., 89 F.2d 224, a judgment on the fidelity bond involved was reversed because it did not appear that the plaintiff-obligee, Franklin Savings and Loan Company, owed debts or was insolvent so as to make the dividends which were declared out of capital assets to be misappropriations, and because so far as appeared a recovery would inure to the benefit of the stockholders who received the dividends. On a second trial it was shown that losses seriously impairing the capital had been incurred in each of the periods for which the contested dividends were declared, that large amounts of debts remained unpaid on each occasion, and that about eleven months after the last the corporation went into receivership insolvent, and that a liquidation will not pay outstanding debts and no stockholder will receive anything if the bond is paid. The Judge nevertheless held that no case for recovery was made out, and nonsuited the action.

This ruling, made on a misunderstanding of our former opinion, was erroneous. It is true in Georgia, as elsewhere, that dividends can rightly be declared to a corporation's stockholders only out of net profits. Crawford v. Roney, 130 Ga. 515, 61 S.E. 117. The Georgia Code, § 22-713, imposes a double liability on the officers of a corporation for declaring a dividend or distributing the corporation's moneys to its members otherwise than from "actual legitimate net earnings, and which in any manner increases its debts"; and Section 22-9901 punishes such act as a crime. The dividends here in question were not in fact declared and paid from actual, legitimate net earnings, and were misapplications of the corporate assets if they "in any manner increased the corporate debts". The meaning of the last phrase is not clear and has not been determined by the State Supreme Court, but was referred to by the Court of Appeals in Mangham v. State, 11 Ga.App. 440, 446, 75 S.E. 508, as including the creation of debts to the stockholders by the very act of declaring the dividend. The court, however, recognized that no valid debt to the stockholders would be created by an unlawful declaration; so that if this be the intent of the statute the words have no practical application. We rather think the Legislature intended to forbid declarations and disbursements which, although no money was borrowed to make them, would after their consummation leave an increased amount of debts unpaid above what there would otherwise have been. In other words, the statutory penalty or punishment will be visited only where there are creditors who ought to have been paid in preference to stockholders. Thus understood, there was no statutory misapplication in paying these dividends as the case appeared when previously here; but there was such misapplication under the present evidence, for while there was not insolvency when each dividend was paid, there were debts which went unpaid in consequence, and these debts, whether owing to the same creditors or to successors whose money paid them, continued until insolvency and are still unpaid. There was not a mere distribution to the owners of the corporation of corporate funds on which no one else had a claim, but there was a misapplication, whether so understood and intended by all the directors who authorized it or not, of capital which was in effect pledged to be maintained intact until all corporate obligations should be discharged.

Was there a breach of this bond? Is the corporation through its receiver entitled to complain at what its own unbonded directors did? The bond covers no director save James H. Fowle, who was the executive officer in full charge of the business. The surety agrees to pay the

corporation "the amount of any pecuniary loss" which Fowle might cause it "through any act of fraud, dishonesty, forgery, theft, larceny, embezzlement, misappropriation, wrongful abstraction, or wilful misapplication". So far as these dividends are concerned, Fowle did not do any act of forgery, theft, larceny or wrongful abstraction. But we think he did do acts of fraud and wilful misapplication. The dividend payments were, as we have seen, misapplications of the corporate money. Fowle himself made the actual disbursements, and he knew they were misapplications and made them wilfully. He is not excused from blame because the Board of Directors authorized the payments, for it clearly appears that they acted on false information given them by him in each instance for the purpose of causing the dividend. It does not appear that Fowle received any dividend, but he was President and apparently part-owner of a separate concern which was engaged as exclusive selling agent for the stock of Franklin Savings and Loan Company, and was making large commissions therefrom and apparently not turning in all of the sales price due to the corporation. The stock could be sold more easily and more extensively if it paid regular dividends. Large amounts of stock were sold after, and probably in consequence of, each dividend. This fraudulent motive actuated Fowle in wilfully misrepresenting to the directors the business of the corporation in his hands. They relied entirely on him, and innocently carried out his plans as they swear. Under these circumstances the act of declaring the fraudulent dividends was the fraudulent act of Fowle. Compare United States v. Giles, 300 U.S. 41, 57 S.Ct. 340, 81 L.Ed. 493. He had so dealt with the Board of Directors, who trusted him, that neither he nor his sureties can be heard to say that the declaration and payment of the dividends was the corporation's act of which it cannot complain. The corporation and its receiver were and are bound to protect the corporate creditors, and when there are creditors no defense can be found in the fact that the stockholders got the dividends. There was a loss to the corporation within the terms of the bond when the corporate funds were removed from the corporate coffers and made unavailable to pay the corporate debts. Under decisions like McDonald v. Williams, 174 U.S. 397, 19

S.Ct. 743, 43 L.Ed. 1022, and Carlisle v. Ottley, 143 Ga. 797, 85 S.E. 1010, L.R.A. 1917C, 393, Ann.Cas.1917A, 573, the stockholders who innocently got the payments can probably keep them. If in fact any received them knowing that the dividends were fraudulent, there may be ground for marshalling such stockholders' liability to exonerate the surety. But no such question arises in this action at law upon the bond. The evidence introduced, if believed, tends to show a liability on the bond. A nonsuit should not have been granted.

■ A defense is urged in that the bookkeeper, a girl under age, was a director and necessarily knew about the corporate affairs and that her knowledge is imputable to the corporation and it should, under the terms of the bond, have given the surety notice at once of Fowle's dishonesty. But this girl testifies she was without experience or appreciation of the significance of the book entries which Fowle directed her to make, did not understand the legal basis for dividends, and did not realize that anything wrong was going forward. If she speaks truly, we think there is no necessary notice through her to the corporation which would have required it to give notice promptly to the surety. If she is testifying falsely, there would be reason to believe that she was in collusion with Fowle, and in that case by the terms of the bond the surety would still be bound. These questions of fact are not grounds for nonsuit, but rather demand that the Court proceed to a decision.

■ It is lastly contended that the sworn proofs of loss should have been rejected from evidence and a recovery denied because not timely made and not covering the case now asserted. The bond provides: "The employer shall give notice by registered mail to the surety at its home office, Boston, Mass., as soon as possible after becoming aware of any act committed by any employe which may be made the basis of claim hereunder, and within ninety days after date of said notice shall file with the surety an itemized claim hereunder duly sworn to. * * * No action or proceeding at law or in equity shall be brought to recover any sum hereunder unless commenced and process served on the surety within a period of twelve months next after notice of claim shall have been given as hereinbefore pro-

vided". There are no words expressly providing that strict compliance is to be a condition of liability. In the absence of such words the law of Georgia, under which this bond was written, inclines to hold that liability is not defeated by want of strict timeliness in making proofs of loss. Southern Fire Ins. Co. v. Knight, 111 Ga. 622, 36 S.E. 821, 52 L.R.A. 70, 78 Am.St.Rep. 216; People's Loan & Savings Co. v. Fidelity & Casualty Co., 39 Ga.App. 337, 147 S.E. 171. In a case from Florida, under somewhat different wording we held that timely notice of claim as distinguished from proof of loss was a condition of liability. Murray v. American Surety Co., 5 Cir., 69 F.2d 147. In the present case the notice of claim by registered letter addressed to the surety company at its home office was posted April 21, 1934, and received two days later in Boston. No point is made on it. On July 19th, eighty-nine days after April 21st, a sworn proof of loss was similarly mailed, and received in Boston after two days. The contention is that this proof had to be *filed* within ninety days from the *date* of the notice, and that this proof of loss was not filed until it reached the home office on July 23, ninety-one days after the date of the notice. Assuming, without deciding, that compliance as to time is a condition of liability, we think the interpretation contended for is too strict. The quoted provision of the contract requires a prompt notice of a claim given the surety company at its home office in Boston by means of a registered letter, and a sworn statement of the details furnished within ninety days after the notice, and suit, if any, within twelve months after the notice is given. The word "filed" is not to be taken in a technical sense. The mail is proposed by the surety as a means of communication. When the notice is mailed and registered as stipulated, and within ninety days from the mailing of the notice the sworn statement is likewise mailed, and each reaches the surety after two days in due course of mail, there has been a substantial compliance with the condition. It is unnecessary to inquire whether the "date of notice" is that of the mailing or of the receipt of the notice, or whether the sworn statement is "filed" at mailing or on its reception in Boston. The court will not follow a refined construction of the language used by the surety in the bond to defeat the promised and paid for protection under it.

 The sworn proof of loss identified the dividend payments alleged to be illegal, asserted that when made the corporation was hopelessly insolvent and that they were paid out of capital and deposits in order to create a market for Fowle to sell the stock. Although hopeless insolvency when the dividends were made was not finally relied on or proven, but only serious impairment of the capital with debts carried over unpaid, followed by eventual insolvency, there is not a fatal departure from the original claim. That claim gave a fair notice of the amount and nature of the liability now asserted, and that is enough. The court did not err in overruling the demurrer to the petition, and in admitting the proof of claim in evidence. On the cross-bill of exceptions the judgment is affirmed.

On the main bill it is reversed, and the cause remanded for further proceedings consistent with this opinion.